11-0-4-0-0 Richard Colleton Life Insurance v. Ryan Hamer Go ahead. May it please the Court. I'm Eric Truitt. I represent the Illinois Department of Revenue in this case. This case concerns the meaning of the 2003 Tax Amnesty Act. Excuse me, Counsel. I didn't get your name. What is it? Eric Truitt, T-R-U-E-T-T. Thank you. You're welcome. This case concerns the 2003 Tax Amnesty Act. This statute authorized the Department to create an amnesty program for all taxes due during a 10-year period. The taxpayer holding that phrase, all taxes due, means all taxes due that were also assessed by the Department prior to closing. Excuse me. Give me your best case that's going to indicate to us what tax due means. There is, unfortunately, no case. There are statutes that indicate when a particular type of tax is due. So in terms of authority for our definition of all taxes due, the best example would be Section 601A of the Illinois Income Tax Act. What about the case that your opponent cites? The case Schmidt? Yes. The case Schmidt is, there's one sentence in there about all taxes due, but that sentence is obitur dictum, and I can go through the reasons why it is obitur dictum. So we should just ignore that? Well, it should only be taken for the extent that it's persuasive, and I'd argue that one sentence of an issue that was not considered in full is not particularly persuasive. For example, So there are no cases? There are no cases on this particular issue. Go ahead. So I'd start first, since there are no cases that directly govern this issue, we'd start first with the plain language of the statute. All taxes due means just that, all taxes due, and to determine if a tax is due, you would look at the particular tax statute to ascertain when a particular tax is due. So in the context of this case, which is income taxes, we would look at Section 601A of the Illinois Income Tax Act, and Section 601A says that income taxes are due on the date on which the return for that tax year is due. So here, any tax that is due during the 10-year period of tax periods that are eligible for amnesty, any tax due during that period will be eligible for amnesty. Even if it's unknown? Yes. Okay. Because under the tax rules, taxes always do when the return is due, even if it's later adjusted or altered. Metropolitan files their return. They file the return together with whatever they can do other than that at that point in time. Well, at that point in time, they owe all taxes that are properly recorded. So the fact that they underpay means that they would subsequently owe interest. Well, that's down the road. But their good faith basis for this is the information they have at hand, and they go ahead and they file the return with the amount they do. Yes, but as a matter of tax law, the amount due at that time is not the amount that they say is due. It's the amount that's properly reported. And as an explanation of that point, you'll see that they're only challenging double interest in this case. They admit that they owe interest dating back all the way to when the returns were due. If taxes aren't due until the taxes are ultimately assessed by the department, then they would only owe interest dating back to 2004 instead of all the way back to 1999 and 2000. So in a sense, there's a bit of a, because taxation relies on a self-reporting system, taxes are due in all instances before there's an ultimate determination about what the proper amount is. But just as a matter of the tax statutes, the tax statutes say that all taxes, all taxes are due on the date that the return is due. I'm kind of a simplistic guy. I don't grasp these real complicated issues. So let's see if I can make it real simple. If the tax year we're talking about is 2010, and somebody fills out a tax return and says my gross income was $80,000 and they're a 20% taxpayer and pay $16,000 in taxes, but it's later determined that their real income was $100,000, which would have required the payment of $20,000 in taxes, how much tax was due on April the 50th of 2011? Well, the full amount that was properly owed was due when the return for that year was due. So if they paid $16,000. Did I make it too complicated? I'm just trying to figure out. So the April 15th, 2011 would be the date that their 2010 return was due. $20,000 were due at that date, not $16,000. And if you were subsequently found in 2014, say it was ultimately determined that you did owe $20,000, you would have to pay the balance $4,000 and you would owe interest dating back to April 15th, 2011, not the date on which there was the final assessment or final determination. So we see in the income tax context, all taxes due means what it says, all taxes due. There's nothing in the Amnesty Act that says it has to be a tax that's assessed by the department. Now this raises a practical question about what a taxpayer can do in a situation where the taxes due but they don't know the precise amount because there could be a future federal change. And that's why the department issued regulations to deal with this very situation. If you look at the 2003 regulations, there was a provision for a good faith estimate payment and there was also a provision specifically for taxpayers that were under audit allowing taxpayers under audit to make a good faith estimate. And as an empirical matter, numerous taxpayers made these good faith estimate payments and every taxpayer that applied for a refund received one as long as they executed a stay of the limitations period with the department. So the arguments that they've made about the practicality of the amnesty program, how could we possibly know what taxes were due, how could we possibly make a payment when there's going to be a change in the future, there were other ways to claim this. Why isn't the, you know, they talk about this good faith estimate. Isn't that what the taxpayer did when he filed his return? Didn't he at that time either pay or request what he felt, or he had to pay, let's assume he had to pay, that he, based on the information he had at hand at that time, he made a good faith estimate and he paid the taxes. Why isn't that sufficient? Well, the, there are two concepts of good faith that I think we're discussing here. There's the There's the government's ruling and then there's the plaintiff's ruling. Well, there's a good faith in sort of a colloquial sense, which is when a taxpayer fills out their tax return, they're expected to be honest. But as we know, I mean, especially in the area of corporate taxation, when you're dealing with complex tax issues, they may be taking particular positions on which the IRS has not made a ruling yet. So it may be good faith, but it may be ultimately wrong. And the consequence of that could be several hundred thousand dollars or millions of dollars. So the fact that they may have been taking a position that was not, that was in good faith in the sense that it was not frivolous or, you know, somehow directly contrary or criminal or something like that, that's one concept of good faith. The concept of good faith in the free amnesty program was you are either under audit or you possibly have, or you have taxes that are due to the department that are not yet determined. You can avoid interest on those outstanding tax liabilities by making an estimate or reasoned judgment about how much you potentially owe to the department. If you underpay, you get the benefits of amnesty for the amount that you paid. And if you overpay, you file a protective refund application or you execute a stay of the limitations period with the department, and then you can be credited or refunded in the future. So the good faith in the context of the 2003 amnesty program has a more specific meaning. It's give us an estimate of what you could possibly owe. I think it's analogous to how you might settle a jury case. A case is about to go to jury. The jury could decide that the victim's life was worth one million dollars. The jury could decide that the damages are ten million dollars. The jury could decide that the defendant is not liable and award zero. Yet in order to settle a case, you have to make a probabilistic estimate about what the value of the case is and what the probability of certain determinations by the judge and jury are. Same sort of skills would be involved here in making a good faith estimated payment. You don't know for sure, but certainly, especially an insurance company, would have the expertise to make these kinds of probabilistic judgments about things that could happen in the future. And again, there were numerous taxpayers, as stated in the record, that actually did make these good faith estimate payments. And one example of those is the Star Reply brief. That was a company, while not as large as Metropolitan Life, that company had a hundred million dollars in revenues. So we're not talking about a simple tax issue here. And they were able to make a good faith estimate payment. It ended up being excessive and there were issues about the limitations period there, but I think the case stands for the fact that they were able to make this kind of judgment and participate in the amnesty program. So again, the plain language of the statute does not support the circuit court's view. The circuit court also relied on the Schmitt case, which Your Honor referred to earlier. But the Schmitt case, the statement about all taxes due was obiter dictum. It was unnecessary to the outcome of the case, because the issue in Schmitt was whether or not an amnesty payment, you could simultaneously seek amnesty and also challenge your tax liability in an administrative proceeding. And Schmitt said, no, you cannot. Your choice of remedy is final. You either apply for amnesty or you can test your tax liability in some other way. But you can't have it both ways in an administrative proceeding. So the definition of all taxes due in that single sentence in Schmitt was not necessary to the resolution of the issue in Schmitt. You don't have to define all taxes due to decide that the taxpayer has one or the other choice. They can either participate in amnesty or they can challenge the tax liability in an administrative review action. Also, that sentence about all taxes due is not an integral part of the opinion. The court gave several reasons why you could not simultaneously challenge your tax liability while participating in amnesty. Most of it was based on the structure of the act and also the department's regulations. All taxes due is only a small sliver of the analysis in the overall opinion. And finally, it's not as fully considered as it would have been had it been essential. For example, the court in Schmitt did not even consider what the meaning of its holding would be in the income tax context where all taxes are due on the date that the return is due, but you could have changes years down the line. Under the court's holding in Schmitt, it would be difficult for you to participate in the amnesty cutoff. For example, the amnesty cutoff in Schmitt, I believe, was in June of 1984. So if you could only participate in the amnesty program if you had a final assessment, most corporate income taxpayers couldn't participate for several years preceding the end of the amnesty period because of the time that it takes to go through the federal process and report the federal changes and all of that. So again, Schmitt didn't really consider what its holding would mean for the income tax context because it was a sales tax case and it really wasn't deciding when taxes were due. It was deciding this choice of remittance issue. And one final point on that is if you look at the follow-on case Figge, Figge describes the reasoning of Schmitt, but nowhere does Figge say that Schmitt turns on the definition of all taxes due. The term all taxes due does not appear in the Figge opinion. So if you would expect a case a year afterwards that's adopting the reasoning of Schmitt, if all taxes due were integral to the reasoning of Schmitt, you would expect that follow-on case to make some mention of that point. There's no mention of all taxes due in the Figge case. It's simply adopting the Schmitt holding as to the choice of review or you can do amnesty, you can't do both. So the circuit court's decision was contrary to the plain language of the statute. It was also relied on Schmitt, which is dictum. And the final point I'd like to raise is the point about the 2010 amendments. The 2010 amendments stated that tax is not eligible for amnesty. If the circuit court's view of the 2003 amnesty act was correct, this amendment is very difficult to explain. Number one, if federal changes were never eligible for amnesty, why would you need to adopt a specific amendment saying that they're not? And secondly, under the Schmitt and the circuit court's view of the statute, it's not only federal change that are not eligible for amnesty, it's any tax that's not assessed. So why in 2010 would they only specify federal change liability if they had intended to adopt the prior view that any tax that was not assessed was not eligible for amnesty? So the only possible explanation of the 2010 amendment is that all taxes due were eligible for amnesty and the General Assembly decided for its own policy reasons to limit the scope of that of the 2010 amnesty program by not including federal change liability. Counsel, thank you. We'll give you some time out of rebuttal. Counsel? Good morning, Your Honors. John Beek for Appalachian Metropolitan Life Service. The record shows that MetLife was not the scofflaw, let alone the criminal taxpayer in need of a pardon, that the Department has made the company out to be in its briefs in this matter. The record shows that MetLife timely filed its federal and state income tax returns for 1998 and 1999 and paid the tax liabilities that were reported in good faith on those returns. The record shows that MetLife timely filed its federal and state income tax returns for its 1998 and 1999 years during the amnesty period. That's how the Department framed the issue in this case before you. And consistent with long established Illinois income tax procedure, MetLife, once it had a finalized federal change liability, that is once the IRS had finished up its audit and come to terms with MetLife, MetLife timely reported that federal change liability to the Department under Section 506B of the Illinois Income Tax Act and it paid the liability. And under the Illinois Income Tax Act, during the amnesty period and today for that matter, Your Honors, taxpayers are not allowed, let alone required, to estimate how much a federal change liability might be down the road and pay that amount in. The way the procedure works under Section 506B, and this is well established, is that the taxpayer is to wait until there's a finalized federal change liability and then report that liability to the Department on an amended return under Section 506B. And when it's determined that you have additional liability and you're waiting until the original return was due? Well, Your Honor, it is the Is that a yes or a no? Yes. Okay. Go ahead. May I add a little bit of flavor to that? Go ahead. Because it is true that in this matter, for that matter, this case, once MetLife had that finalized federal change tax liability post amnesty period, eight months post as it turned out, and reported that liability to the Department under Section 506B, there was now a deficiency that was deemed assessed under Section 903A, and then interest accrued back on that federal change tax liability to the due date of the returns for 1998 and 1999. And that's what MetLife paid. It was that single interest. And that single interest represented, with 20-20 hindsight, you know, post amnesty period, the time value of this additional income tax liability that MetLife turned out to have once the IRS audit ran its course and the federal change liability was determined. So with 20-20 hindsight, there was that liability, and MetLife paid that. And MetLife doesn't dispute that it owed the single interest. But I think it's also fair and reasonable to say that MetLife didn't have a way to predict or know what its federal change tax liability was going to be. Mr. Truitt just said before you that corporate income tax returns are complicated matters, that there are a lot of issues swimming around in them, and even a sophisticated taxpayer doesn't know with clarity and with a crystal ball what the federal change tax liability and adjustments are going to turn out to be during the amnesty period. And that's what the department was asking MetLife to do. So I think the question before the court this morning is whether, as the department has asserted and claimed in its briefs, the phrase all taxes due in the 2003 Amnesty Act encompasses whatever the Illinois tax liability ends up being or turns out to be for a tax period covered by the 2003 Amnesty Act, and whether that's the case, as the department says, even in situations where the department and the taxpayer didn't know what the federal change liability was going to turn out to be, didn't know that during the amnesty period. Now, we would submit that the circuit court correctly held in this case that the Amnesty Act was intended by the General Assembly to voluntarily pay their known tax liabilities, known during the amnesty period based on the facts that the taxpayer had. And as Mr. Truitt said, the 2003 Amnesty Act did not define the phrase all taxes due, but the General Assembly in the 2003 Act used the same phrase that it had used back in 1984 in the 1984 Amnesty Act. And this wasn't happenstance. It was not happenstance. Representative Curry explained to the other members of the General Assembly when they were debating. Can you explain to me why a sophisticated taxpayer like MetLife would not be able to make the required good faith estimate of the amount of their potential liability? Well, Your Honor, it's because these were complicated tax returns, as Mr. Truitt said. During the amnesty period, that six-week period, I think it was roughly October to mid-November of 2003, what MetLife had in front of it was a pile of what were called notices of proposed adjustment, NOPAs. And what NOPAs are, Your Honor, in the income tax procedure is a piece of paper that the IRS has put in the hopper for further discussion. The NOPA does not represent a tax liability that has been assessed or a determination that there actually is a liability. This is an issue that the IRS agent is putting in the hopper for further discussion with the taxpayer down the road. And so MetLife had some of those NOPAs in front of it. There had been no discussion of any of the NOPAs. In fact, I think the record is actually that that initial discussion of NOPAs didn't even occur until the day before November 17 when the amnesty period ended here. So there had been no discussion of that. And I think 63 of the NOPAs that ultimately were part of the discussion and worked their way into the federal change tax liability hadn't even been issued to MetLife by the end of the amnesty period. So what I'm trying to describe here, Your Honor, is that this was a very fluid situation. There was certainly an indication of some issues that the IRS agent had put in the hopper for further discussion. But there hadn't been that discussion and nobody knew what that federal change liability was going to be. And that didn't happen until there were those reports that came out in this matter in August of 2004. There was that finalization of the federal change liability. And then MetLife, as it was supposed to do under the Income Tax Act, reported that to the agent, paid the liability, and did everything that it was supposed to do under the Illinois Income Tax Act. But I think that, you know, even sophisticated taxpayers don't know what the liability is going to turn out to be. Certainly MetLife, you know, had substantial experience with federal tax audits and knew that by no means does every NOPA ultimately stand up as a liability. Some of them will, sure, but not all of them. And I think what we need to bear in mind here is that the way the department rigged this up under its amnesty regulation was that a taxpayer in MetLife's situation, in the department's view, was supposed to somehow make a good faith estimate. They were supposed to have that crystal ball. And if it then turned out that they had underpaid that estimate, that they had not, you know, guessed high enough, that the department clearly says they would go in and tag that taxpayer with double interest and maybe double penalties on that shortfall. So this was the way it was rigged up in the regulations. This was kind of a heads we win, tails you lose situation of it's submit your honor under the department's regulation. The department was fully applying hindsight, fully claiming the benefit of hindsight, and it was the taxpayer that was, I think in the naive view of the department, supposed to be paying the amnesty, period. Counsel, give me your definition of all taxes due. Your honor, we would say that it's a tax liability that was known to the taxpayer and assessed. That's what the appellate courts in Schmidt and Figge said, and that's what Judge Murray correctly determined in the circuit court in this matter. Do you have any other cases that discuss this matter or give some type of a definition of all taxes due other than the Schmitt case? Your honor, it would be Schmitt, and then it's true Figge applied Schmitt, but I think it's those two. Those are cases, your honor. Now, I think what we also have is, you know, the debates in 2003 in the General Assembly, and we've laid some of that out in the briefs, your honor, and all of the legislators who, you know, were in those debates. Through their comments, we're thinking of known tax liability. Senator Welch, one of the co-sponsors, explained that what the legislation was supposed to be doing was collecting past due taxes, and that the idea here is that we can get these taxes due off the books. Senator Link, another co-sponsor, said, you know, what we're trying to do is collect a bill from taxpayers that admit us money and are willing to pay. And Senator Welch, a third person in the debates, agreed that the 2003 amnesty program was intended for taxpayers who admit they owe a certain amount of money and pay it. And so I think the legislators in 2003 were contemplating known, maybe reassess tax liabilities during the amnesty act, and the idea here was to get those taxpayers to go in, make their payment to the department without further litigation and all of that, and get money into the state's hands. They weren't intending for this all taxes due to encompass any tax liability, no matter how unknowable that arose. If this theory were correct, the regulation 15170 is meaningless, because it says the taxpayers under audit may participate in the program by following the procedures set out in section K above and making a good faith estimate of increased liability. If your theory were correct, if you were under audit, you would never have to make an estimate of good faith liability, because it's not been assessed yet. It's not known. I don't want to name taxpayers or anything, but I can think of a matter we had over there, very large federal audit, okay, that was not finalized during the amnesty period. But that taxpayer was actually far enough through the federal audit that the taxpayer knew what the federal adjustments were going to be. And that taxpayer actually did take advantage of the provision that you read, your honor, in the regulation and went in and reported those known tax liabilities as a good faith estimate in order to get the abatement of the interest and penalties. So it's possible that the department, you know, I think a way to read that statement in the regulation is that the department was giving the types of taxpayers that I just described an opportunity to make a good faith estimate, pretty noble estimate of a known federal change tax liability, what it was going to be, run in, pay that money to the state and obtain the benefit of the abatement of the interest and penalties. And I believe that statement in the regulation uses the verb may. It doesn't say shall. And so the statement of the regulation does not say taxpayers that are merely in the midst of an IRS audit during the amnesty period, you know, shall make a good faith estimate and pay it in. And if they don't, they're going to be subject to the double interest and double penalty provisions. But in this case, the taxpayer wasn't anywhere near that kind of a situation, was he? I mean, the final returns or the adjustments made by the IRS and the state didn't occur for many years thereafter. Am I correct or incorrect? Well, certainly long after the amnesty period. The amnesty period ended mid-November 2003. This IRS audit then finally picked up steam coincidentally and MetLife and the IRS agents came to agreement in I think it was August of the following year. So it was long after. I don't want to say that it was years after. But to MetLife it probably felt like it was years after because this audit had been you know, as the General Assembly is considering and passing the 2003 Amnesty Act and using the same phrase, all taxes due, that they had used back in 1984. And it is the same phrase. They did not have any precedent before them of a good faith estimate procedure in the 1984 Amnesty Act because it hadn't been there. The Department had not, you know, said in the 1980 period should make a good faith estimate and pay it in. So I think that informs too our inference as to what the legislative intent was here because the legislators didn't have that precedent and it's reasonable to think that they were not contemplating that the Department would impose a good faith estimate payment procedure on taxpayers as it was in the 1984 Amnesty Act. They brought out their regulations in a short period of time and imposed this duty on the taxpayer. The duty as they see it. As I said, the word is may. Now it's may and L, but K makes it pretty clear that you've got one of two choices. You either pay up or if you make a good faith estimate and you're low, you're going to pay the penalty on the difference. So when you say may, I mean, what are your choices? Don't pay anything at all and pay 200% on all of it? Yeah, I guess you've got it. You're free to do that if you want to do that. I don't know who would do it, but well, so the may is not exactly a do it if you feel like doing it, nothing's going to happen to you. What's going to happen to you is if you don't do it, you're going to pay 200% on all of it. Right. That's one way to view it, Your Honor, and I don't want to sound like I'm quibbling, but there's kind of a general rule, pay taxes in, and then the way I at least read the back part of the regulation where we are right now and K and L is, oh, and by the way, if there's a taxpayer in the midst of an IRS audit, they may decide to pay it in. And you're right. Certainly in the example I gave you of another client in a former firm, they saw an opportunity and they went in there and ran for it. That by no means, though, was MetLife's situation. The fact is that this good faith estimate procedure was a creature of the Department's regulation. It's not in the statute. It's not a part of the 1984 regulation, and we would submit that the Department really went well beyond what the statute contemplated and the General Assembly contemplated in drafting this regulatory provision, and so the provision is invalid for that reason. The 2010 Act, I think, is some evidence because when the legislature did another amnesty act and used the same phrase, all taxes due, they made it explicitly clear that federal change tax liabilities that weren't yet final during the amnesty period were not going to be subject to the double interest and double penalties. And I'm not suggesting or pretending that that was that the General Assembly thought that the Department had overreached in its 2003 Amnesty Act regulations. As we've said, based on what the MetLife had in front of it in the way of some NOPAs, not all of the NOPAs, no real discussion of any of them at all, the record, I think, shows that MetLife was not in a position during the amnesty period to make an educated guess, let alone a good faith estimate, as to what its liability was going to be. It could have guessed, it could have paid something in, but if it paid too little in, it is very likely the Department admits that it would have been fully ready to run in and assess double interest and maybe double penalties on that shortfall. So this is not, if the Department is suggesting that if MetLife had just paid something, we wouldn't have any double interest issue, that that's not the way they had done this in their regulations and they would admit that. Finally, there are, I think, substantive due process issue that maybe wraps itself around all of this, because what I'm describing here, I think, is a fairly arbitrary procedure in the regulation where the Department was wanting taxpayers in a situation like MetLife to make a guess as to what their liability was going to be post-amnesty period, once the IRS audit was done, pay it in, and in order probably to really avoid double interest, because that's fairly serious money, very likely overpay it. You know, guess high. And then what the Department was coupling with that was a very, very short limitation period, just one year on the ability of the taxpayer to claim back a refund once the amnesty, once the IRS audit was actually completed and now the taxpayer under Section 506B had something that they were to report as their federal change liability. And that one year period was very short for IRS audits like this one continued on. The Department, I think, says kind of blithely that, well, MetLife could just have requested a waiver. What's the problem? Well, I think the real question is, you know, viewing this from the perspective of a taxpayer like MetLife during the amnesty period, why would they think that the Department would have helped them out post-audit by giving them a waiver of that one year period? The Department would always have two years beyond the reporting date of the federal changes to issue an assessment. So the Department would never need a waiver from the taxpayer. It was the taxpayer that would need a waiver from the Department. And I think reasonable, sophisticated taxpayers would not have expected that the Department would just accommodate them on a request like that when it meant the state giving money back to the taxpayer. And the Dan Hall affidavit that the Department repeatedly cites, I think it's interesting what it doesn't really say and describe. You know, it doesn't describe what were the circumstances of the several dozen taxpayers that supposedly made good-faith estimate payments during the amnesty period. That is, how far along in the IRS audit were they and how knowable were their federal change tax liabilities? I've described to you one situation where it was very knowable. The affidavit doesn't describe how many of the good-faith estimates payments that were made to the Department turned out to be too low and those taxpayers were hit with double interest and maybe double penalties by the Department. And the affidavit doesn't tell us how many taxpayers were barred from getting a refund of their amnesty overpayment because they were beyond the one-year limitation period. We know of at least one, and that's that ABC Transportation Company case that my opponent cited to you. So just in summary, I'll make this one sentence because I think I've gone beyond my 15 minutes and I'm sorry about that. You know, the Department here I think is really applying a totally backward-looking procedure in their regulation, a procedure that is well beyond what the statute and all taxes do meant. And I would submit that Judge Murray was quite correct when he ruled in his summary judgment order that the 2003 Amnesty Act applied to known assessed tax liabilities and that MetLife's 1998 and 1999 federal change tax liabilities were not finalized, not knowable during the amnesty period. That didn't occur until well after the amnesty period. And so it's, you know, incorrect, inappropriate for the Department to be assessing double interest against MetLife, certainly on its set of facts. And I would ask that this Court affirm Judge Murray's decision. Thank you. I'd like to start with the issue of legislative intent that he discussed. The 1984 Act also does not define all taxes due. So the only case that, the only thing that allegedly would have defined all taxes due would have been the Schmidt decision. But as I explained, it's one sentence in a larger opinion. There's no reason to think that 20 years later the General Assembly would have seen that one sentence in Schmidt and said, oh, these words must mean what the Schmidt Court said they mean that the fact that the 2003 Amnesty Act uses the same phrase, all taxes due, is not significant if you don't agree with the Schmidt's, their argument that pertains to Schmidt. In other words, if we knock out Schmidt, I don't think you get any additional pull from the words all taxes due being the same in both statutes. The second thing I'd like to say about legislative intent is that in 2003 we were facing a different fiscal situation. And so in both of these, in 1984 and 2003, the General Assembly is saying to the Department of Revenue, design an amnesty program that's going to be effective and bring in revenue. In 1984 I believe that was the first amnesty program the department had done. They get information from the process and they know what works in an amnesty program and what doesn't. So you would expect the next time around that the amnesty program is not going to be identical because the General Assembly is relying on the department to draw on its expertise in administering prior amnesty programs and you're trying to draw a balance between bringing in revenue and not being, you know, and concerns about fairness and other political considerations. So I think you see changes each time in the amnesty acts because there's always going to be a balancing between those various considerations. Are we going to bring in enough revenue? Is this going to be reasonable to the taxpayers? Those types of considerations. So you're going to see a different amnesty program each time because the statute authorizes the department to basically design all of the details for the program. So you're not going to get a cookie cutter amnesty program each time. And that's what the General Assembly, that's why the General Assembly entrusts the design decisions to the department instead of laying out in great detail in the statute all of the things that the department has to do to implement the program. So in 2003 we have a severe financial crisis. The General Assembly changes the incentive structure in the 2003 Amnesty Act. In 1984 it was simply a 50% abatement of interest. This time around the General Assembly says 100% abatement of interest if you participate, 100% additional penalty if you do not participate. So when the department is designing that program it's obvious from what the General Assembly has done that they need to increase participation. And one way of increasing participation is by allowing taxpayers who have taxes that are due but are not yet assessed or known to participate through this good faith mechanism. So the good faith mechanism is consistent with the legislature's intent to increase participation in the program and bring in more revenue. Because as I explained in my opening comments in the 1984 Act, because of how the program was designed there were a lot of income taxpayers that would not have been able to participate which would then limit the amount of revenue that the amnesty program could raise. And so you get a different program in 2003 because the statute is different in some ways and the circumstances are different and also the department understands from past experiences what works and what doesn't. Lastly I'd like to touch on the due process concerns. Listening to his arguments I think you could say those same things about 100% interest in the basic tax structure. The withholding provisions, the fact that you have to pay tax on your tax return before there's a final determination, the fact if it's subsequently changed you owe 100% interest. If his theory about due process is correct as to 200% interest it seems equally arbitrary to assess 100% interest. There's no explanation why 100% interest and 200% interest are different for the purposes of due process. And as our brief explained, the standard for substantive due process is whether there's a reasonable relationship. One of the goals of the 2003 Amnesty Act, indeed every amnesty act, is to raise revenue and increase participation in the amnesty programs. And so the department's good faith estimate provisions are reasonably related to that goal. It allows income taxpayers who couldn't have participated under the 1984 program to participate in the 2003 program. Thank you. Councilors, thank you. Madam Mayor, we'll take another advisement at this position. We stand adjourned.